IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANDRZEJ WROBEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0182-N |
| | § | |
| PATRIARCH PARTNERS | § | |
| MANAGEMENT GROUP, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was called to trial before the Court. All parties appeared through counsel and announced ready. The case proceeded to trial. Based on the evidence at trial, the briefs, and the arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I. FINDINGS OF FACT

1. Plaintiff Andrzej Wrobel is citizen of California. Defendant Patriarch Partners Management Group, LLC ("PPMG") is a Delaware limited liability company that is a citizen of Florida. Defendant Lynn Tilton is a citizen of Florida.

2. The amount in controversy exceeds $75,000.

3. On or about March 27, 2008, PPMG and Wrobel entered into a contract of employment (the "Contract"). *See* Defendants' Exhibit ("DX") 7. In connection with the employment, PPMG and Wrobel also entered into an "Equity Agreement." *See* DX-8.

4. PPMG is part of a group of companies run by Tilton. Its general business model is to acquire companies that are in distress and rehabilitate them. PPMG is the management entity. Among PPMG's structure is a position titled Platform Leader; each Platform Leader is responsible for supervision of a subset of companies within the overall Patriarch Partners portfolio. Wrobel was hired to oversee a subset of the companies called the Technology Platform, and his title was Platform Leader.

5. During the course of Wrobel's hiring the subject of Wrobel obtaining equity in the businesses was discussed. When Wrobel was hired, equity was addressed in the Equity Agreement. The Equity Agreement was a species of placeholder document. The parties contemplated that it would be supplemented with separate equity agreements for the platform companies, however no such supplemental agreement was ever concluded.

6. PPMG and /or Tilton made no false statements of fact or future intentions regarding equity during the discussions leading up to Wrobel's hiring. Tilton's policy regarding an award of equity to senior management at PPMG was that equity would be awarded if and when a portfolio company was sold. None of the companies within the Technology Platform was sold during Wrobel's employment. This treatment was not inconsistent with any representations regarding equity made to Wrobel by PPMG at or about the time PPMG hired him.

7. One of the companies under Wrobel's supervision was RM Acquisition, LLC ("Rand"). On or about June 2008, Wrobel began acting as the interim CEO of Rand. It was in the ordinary course and scope of the duties of a Platform Leader at PPMG to act as interim

CEO of one of the companies within that platform. Wrobel's service as interim CEO of Rand was within the ordinary course and scope of his duties as Technology Platform Leader.

8.  On or about January 25, 2009, Wrobel sent an email to Tilton requesting additional compensation for serving as interim CEO of Rand. *See* DX-58. Tilton was outraged by this request. *See id.* ("I cannot tell you how disappointed I am at this request."); DX-60 ("you turn my stomach when you ask for increased comp"). Tilton suggested that if Wrobel wanted increased compensation as CEO of Rand, he should take that as a permanent position where he might become a wealthy man from an equity interest in the company if he performed well as CEO. Wrobel never agreed to move from Platform Leader to permanent CEO of Rand and remained as Platform Leader for the duration of his employment at PPMG.

9.  PPMG's policy regarding Platform Leaders' travel expenses was that the Platform Leader would initially pay for the expenses and turn in a request for reimbursement to PPMG segregated by which platform company was associated with the expense. PPMG would then reimburse the Platform Leader and charge each company for that company's share of the expenses.

10. Rand had an in-house travel agency. Beginning around July 2008, Wrobel instructed Jane Sczepaniak to use the Rand travel agency to book as much as possible of his Platform Leader travel for all four of the Technology Platform companies through the Rand travel agency, which would directly pay for all the travel-related expenses to the greatest extent possible. Wrobel would then submit his reimbursement request to PPMG for the non-

Rand companies, and when he received reimbursement, he then would repay Rand for the portion of non-Rand travel expense that Rand had paid through its travel agency.

11.  Wrobel almost immediately fell behind in reimbursing Rand. Beginning around October 2008, Sczepaniak started sending Wrobel periodic emails of increasing urgency reminding Wrobel of his need to reimburse Rand. Finally, around April 2009, Sczepaniak went over Wrobel's head and reported the issue to PPMG management. *See* DX-90. PPMG management investigated the issue and determined that Wrobel essentially was embezzling from Rand. *See* DX-91, 99. PPMG terminated Wrobel's employment on or about May 5, 2009.

12.  Wrobel's practice of routing of expenses through the Rand in-house travel agency was fundamentally contrary to PPMG's policy for handling expenses. Wrobel failed to reimburse Rand for non-Rand expenses within a reasonable time. Wrobel's failure to reimburse Rand for non-Rand expenses within a reasonable time was fundamentally contrary to PPMG's policy for handling expenses. *See* DX-121.

13.  Wrobel at all times intended to repay Rand for non-Rand expenses. Wrobel did not make any attempt to conceal his obligation to repay Rand for non-Rand expenses. To the contrary, Wrobel openly reported all his expenses in a manner that his obligation to repay Rand for non-Rand expenses would be transparent. Wrobel knew that Sczepaniak was aware of and kept track of his obligation to repay Rand for non-Rand expenses.

14.  During the time period Wrobel routed his expenses through the Rand travel agency, Wrobel was experiencing cash flow problems with his personal finances, in part due

to college tuition and medical bills for family members. As a consequence, Wrobel paid other creditors first before repaying Rand. Wrobel anticipated receiving a substantial bonus from PPMG around April 2009, and planned on repaying Rand out of the proceeds of his anticipated bonus. *See* DX-92. That anticipated bonus did not occur.

15. On or about June 21, 2010, counsel for Wrobel purported to file an amended complaint in this action [docket 14]. On June 23, 2010, the Court ordered the amended complaint be unfiled because it was different from the proposed amended complaint that the Court granted leave to file. On or about December 24, 2010, counsel for Wrobel again purported to file an amended complaint in this action [docket 16]. On January 5, 2011, the Court ordered the amended complaint be unfiled because it was different from the proposed amended complaint that the Court granted leave to file.

16. Apparently during 2011, Wrobel communicated with reporters regarding his employment with PPMG. PPMG failed to establish the content of that communication by a preponderance of the evidence.

17. Any of the foregoing findings of fact that are more properly viewed as conclusions of law are also adopted by the Court as conclusions of law.

## II. Conclusions of Law

1. The Court has jurisdiction over the parties and subject matter of this dispute, 28 U.S.C. §§ 1332, 1441, except, as provided by Order dated September 6, 2011, the Court lacks personal jurisdiction over Defendant Lynn Tilton.

2. The Contract was a valid, enforceable contract between PPMG and Wrobel and was governed by Texas law. *See* Contract ¶ 4.4.

3. A material breach of any policy of PPMG constituted "cause" for termination of Wrobel's employment under the Contract. *See* Contract ¶ 2.1(d)(vii). Wrobel's practice of routing travel expenses for all of his platform companies through Rand was a material breach of PPMG's policy regarding expense reimbursement. Wrobel's failure to reimburse Rand for non-Rand travel expenses within a reasonable time was a material breach of PPMG's policy regarding expense reimbursement.

4. PPMG terminated Wrobel for cause. Accordingly, Wrobel was not entitled to severance or other benefits. *See* Contract ¶ 2.2. PPMG complied with its contractual obligations to Wrobel regarding severance under the Contract. PPMG did not breach the Contract.

5. Wrobel failed to establish by a preponderance of the evidence that PPMG breached any agreement regarding equity. It was the policy at PPMG that any equity interest due to a platform leader was due only upon change in control, i.e., sale, of a platform company. None of the Technology Platform companies had been sold during Wrobel's employment at PPMG. Moreover, the Equity Agreement provided that "if at any time your employment is terminated for Cause . . . , then any and all Equity Interest evidenced by this Agreement shall expire and be forfeited immediately upon the termination . . . ." *See* Equity Agreement ¶ 2. Because PPMG terminated Wrobel for cause, Wrobel has no rights to any

equity under the Equity Agreement. PPMG did not fail to comply with any agreement with Wrobel regarding equity.

6. PPMG, through its agents and employees, did not make any false statement of fact regarding equity in connection with Wrobel's employment by PPMG. PPMG, through its agents and employees, did not make any promises of future performance regarding equity in connection with Wrobel's employment by PPMG with an intent, at the time the promise was made, not to perform. PPMG did not commit fraud against Wrobel.

7. Wrobel's acts as interim CEO of Rand were within the scope of his duties as Platform Leader under the Contract. PPMG did not know, and should not have known, that Wrobel expected additional compensation above and beyond compensation under the Contract for acting as interim CEO of Rand. Wrobel did not perform compensable work for PPMG outside of the Contract as interim CEO of Rand. Wrobel is not entitled to recover under quantum meruit for acting as interim CEO of Rand.

8. Under the Texas Theft Liability Act, "[a] person who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE § 134.003. "Theft" is defined by reference to several sections of Chapter 31 of the Texas Penal Code, including section 31.03. *Id.* § 134.002(2). Section 31.03 of the Penal Code provides that "[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." In pertinent part, "deprive" means "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." TEX. PENAL CODE § 31.01(2)(A). Wrobel,

in his handling of reimbursements with Rand and PPMG, did not intend to deprive Rand or PPMG of property. At all times Wrobel intended to repay Rand. Wrobel did not commit theft. Wrobel is not liable to PPMG under the Texas Theft Liability Act.

9. Paragraph 3.7 of the Contract provides in part:

> Nondisparagement. During the Term and thereafter, the Executive shall not make any statements or comments that could shed an adverse light on the business or reputation of the Company, any of the Company's subsidiaries or affiliates, or any of its or their respective officers, directors, agents, executives or employees; provided, however, the foregoing limitation shall not apply to (i) compliance with legal process or subpoena, or (ii) true and accurate statements in response to an inquiry from a governmental or regulatory body.

PPMG contends that Wrobel failed to comply with this portion of the Contract by attempting to file two versions of his amended complaint [dockets 14, 16] and by statements to reporters.

10. Under Texas law, communications made in the due course of a judicial proceeding are absolutely privileged. *See James v. Brown*, 637 S.W.2d 914, 916-17 (Tex. 1982) (per curiam). This privilege extends to advising the media of the fact of a lawsuit being filed and a description of the allegations. *See Dallas Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 238-40 (Tex. App. – Dallas 2000, pet. denied). Texas courts construe this privilege to reach all tort claims, not just defamation. "Although the privilege arises as a defense to defamation, it must be applied to all of appellant's causes of action. The privilege would be lost if the appellant could merely drop the defamation causes of action and creatively replead a new cause of action." *Hernandez v. Hayes*, 931 S.W.2d 648, 654 (Tex. App. – San Antonio 1966, writ denied).

11.     Consistent with Texas policy, the Court construes the "legal process" exception to the nondisparagement provision to include Wrobel's attempted amended complaints. To construe the nondisparagement provision to reach pleadings in a lawsuit would transform the nondisparagement provision into a covenant not to sue. That would appear to be contrary to the general intent of the parties as shown in the provision to prevent disparagement to third parties but not to prohibit statements in official proceedings. Wrobel did not fail to comply with the nondisparagement provision by attempting to file an amended complaint [dockets 14, 16].

12.     PPMG failed to show by a preponderance of the evidence that Wrobel made any statement or comments to any other reporter or any other person that could shed an adverse light on the business or reputation of PPMG, Patriarch Partners, or Tilton. PPMG failed to show by a preponderance of the evidence that Wrobel failed to comply with the nondisparagement provision in the Contract.

13.     Paragraph 4.10 of the Contract provides that in litigation to enforce or defend any rights under the Contract, a party is the "Prevailing Party" if "such litigation results in a final judgment in favor of such party." It further provides that "the party against whom said final judgment is obtained shall reimburse the Prevailing Party" for its attorneys' fees and expenses. Both Wrobel and PPMG seek recovery of their attorneys' fees and expenses under this paragraph. Wrobel lost on his claims against PPMG under the Contract, but prevailed on PPMG's claims against him under the Contract; conversely, PPMG lost on its claims against Wrobel under the contract, but prevailed on Wrobel's claims against it under

the Contract. Under these circumstances, the Court holds that neither party is a Prevailing Party entitled to recover attorneys' fees and expenses under the Contract.

14. Any of the foregoing conclusions of law that are more properly considered findings of fact are also adopted by the Court as findings of fact.

Signed March 1, 2012.

_____
David C. Godbey
United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 10